# UNITED STATES DISTRICT COURT

## for the

### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>DIGITAL DEVICES SEIZED FROM MARK LEE STELLE | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 2:20-MJ-03890

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1029 and 1028A | *See attached Affidavit* |

The application is based on these facts:

  *See attached Affidavit*

  ☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Scott Robbins
_____
*Applicant's signature*

Postal Inspector Scott Robbins
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

Hon. Michael Wilner, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, x0102, 11th Floor

## **ATTACHMENT A**

**DEVICES TO BE SEARCHED**

The digital devices to be searched (the "SUBJECT DEVICES"), were seized by the Hermosa Beach Police Department from MARK LEE STELLE's hotel room and vehicle on August 10, 2020, and are currently in the possession of Hermosa Beach Police Department stored under case number DR #20-0001414:

1. Grey HP laptop computer

2. Grey ASUS laptop computer

3. Black cellphone with a black leather case

4. Black Cellphone with no case

5. Black SanDisk Thumb Drive

## ATTACHMENT B

**ITEMS TO BE SEIZED**

1.     The items to be seized are evidence, contraband
fruits, or instrumentalities of violations of Title 18, United
States Code, Sections 1029 (Access Device Fraud) and 1028A
(Aggravated Identity Theft), (collectively the "Subject
Offenses"), specifically:

a.     Records and documents referring or relating to
personal identifying information of individuals other than MARK
LEE STELLE, including social security numbers, other identifying
numbers, dates of birth, addresses and telephone numbers, PINs,
credit reports, and bank or other financial institution
information, and records referring or relating to such
information;

b.     Records and programs referring or relating to
buying, selling, or transferring financial account information,
such as credit card numbers, expiration dates, Card Verification
Values (CVVs), and related information;

c.     Records and programs relating to the
counterfeiting or manipulation of credit cards, documents, and
identifications, such as the cutting-and-pasting of signatures,
letterheads, identification photographs, watermarks, and seals,
card designs, and re-embossing or re-encoding cards, including
the altered or counterfeited information itself;

d.     Records referring or relating to mail matter,
shipping packages, or financial accounts not addressed to or
from 392 MISTY FALLS, SIMI VALLEY, CA 93065;

e.    Records and programs relating to wealth and the movement of wealth since June 2020, such as crypto-currency accounts and transfers, other digital wealth storage and transfer methods including PayPal and Venmo, money orders or Western Union transfers, brokerage and financial institution statements, wire transfers, cashier's checks, transactions involving prepaid cards, and/or other financial documents related to depository bank accounts, lines of credit, credit card accounts, the purchase, sale, or renting of automobiles or real estate, or showing or referring to purchases or transactions for more than $500;

f.    Documents and records showing electronic and telephone contacts and numbers called or calling, such as SIM cards, address books, call histories, telephone bills, and email and other electronic addresses, such as those for Facebook, WhatsApp, ICQ, Telegram, and other electronic communication applications;

g.    Documents and records referring or relating to law enforcement or bank or creditor investigations, accounts being closed or at risk of being closed, currency transaction reports, and manipulating transactions to avoid scrutiny such as by structuring cash transactions or creating documentation to satisfy anti-money laundering programs; and

h.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II. **SEARCH PROCEDURE FOR THE SUBJECT DEVICE(S)**

3.   In searching the SUBJECT DEVICE(S) (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be forensically processed at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE(S) as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this

120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel

assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Scott Robbins, being duly sworn, declare and state as follows:

### I.  **PURPOSE OF THE AFFIDAVIT**

1.   This affidavit is made in support of an application for a warrant to search the five digital devices (SUBJECT DEVICES 1-5, collectively, the "SUBJECT DEVICES") seized from MARK LEE STELLE and stored under case number DR #20-0001414. The SUBJECT DEVICES were seized from room 214 where STELLE was staying at the Beach House hotel as well as from the Porsche STELLE was located in, on the property of the Beach House hotel in Hermosa Beach, California on or about August 10, 2020, as described more fully in Attachment A, for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1029 (Access Device Fraud), and 1028A (Aggravated Identity Theft), (collectively the "Subject Offenses"), as described further in Attachment B.  Attachments A and B are incorporated by reference.

### II. **BACKGROUND OF UNITED STATES POSTAL INSPECTOR SCOTT ROBBINS**

2.   I am currently a United States Postal Inspector ("USPI") with the United States Postal Inspection Service ("USPIS"), Los Angeles Division.  I have been employed by the USPIS since April 2005.  I completed a 12-week basic training course in Potomac, Maryland, that included training in mail theft, mail fraud, and financial crime investigations, among others.

3.     As a USPI, I am currently a member of the Identity Theft and Economic Crimes Task Force ("ITEC"), where my duties are to investigate violations of postal law, including identity theft, mail fraud, credit card fraud, and related financial crimes.  During this investigation, I have consulted with other law enforcement officers and agents with many years of combined experience in the field of financial crimes investigations.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.     On August 10, 2020, Hermosa Beach Police Department ("HBPD") Officers found MARK LEE STELLE ("STELLE") in possession of at least twenty suspected fraudulent credit cards, some encoded with information different than what was embossed on the cards.  STELLE was also in possession of multiple false identification documents, including a false California driver's license and a false California Department of Motor Vehicle document depicting STELLE's photograph.  STELLE is also suspected of having used fraudulent identifications and credit

cards to pay for charges at The Beach House Hotel in Hermosa Beach, California from on or about August 1, 2020 through August 10, 2020.  STELLE is also suspected of using fraudulent information and credit cards to rent a Porsche that he was sitting in at the time he was contacted (and subsequently arrested) by HBPD on August 10, 2020.  STELLE also was in possession either in his vehicle and/or in his hotel room of several digital devices believed to contain evidence of the SUBJECT OFFENSES.  STELLE is currently on State of California Post Release Community Supervision (PRCS) and accordingly his vehicle, residence, person, and cellular telephones are subject to search.  Because his search conditions do not explicitly cover other digital devices, however, I seek permission to search them.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

6.    Based on my investigation, review of HBPD investigative reports, evidence, and discussions with HBPD Sergeant Eric Cahalan ("Sgt. Cahalan") and other HBPD Detectives/Officers involved, I learned the following:

**A.    Hermosa Beach Police Identify a Link to Potential Fraud in Progress**

7.    On August 10, 2020, at approximately 2:43 AM, Sgt. Cahalan was in his marked HBPD patrol car and observed a Mercedes Benz driving in violation of a California vehicle code. Sgt. Cahalan noted the vehicle was occupied by at least two subjects, one of them he believed to be female. The vehicle had been travelling north when Sgt. Cahalan first observed it and he was travelling

south. After passing Sgt. Cahalan, the vehicle turned west, so Sgt. Cahalan did the same.  Sgt. Cahalan could then see the vehicle travelling north and observed it to shut off its lights while driving. The vehicle then suddenly pulled to the right and stopped, at which point Sgt. Cahalan saw a subject exit the vehicle from the driver's side (unknown if it was back or front seat).

8.    Sgt. Cahalan drove by the same Mercedes Benz, which he noted was parked illegally. Sgt. Cahalan started to search the area for the subject who exited and witnessed two subjects walking near the Mercedes Benz. Sgt. Cahalan turned his patrol car around in an attempt to make contact with the subjects and the Mercedes Benz, however the subjects ran away on foot when he did so. Sgt. Cahalan called for backup and the HBPD searched for the subjects.  HBPD found a female believed to be one of the aforementioned subjects hiding on a porch on the same block (the 100 block of 34th Place) where Sgt. Cahalan and seen the subjects run away from the Mercedes Benz.

9.    The female indicated she had been drinking and got into a fight with her boyfriend and was just sitting on the porch, although it was not her residence.  She consented to a search and was found to have a laundry bag from the Beach House hotel in Hermosa Beach.  This female denied being linked to the illegally parked vehicle.  This vehicle, however, had a Beach House parking pass (954) visible through its windshield.  HBPD had the vehicle towed for having an expired registration tag.  The female was released from the scene but due to the

suspicious circumstances and the possible connection to the Beach House hotel located at 1300 The Strand, Hermosa Beach, California, Sgt. Cahalan proceeded to the Beach House for follow-up investigation.

**B.   HBPD Officers Contact the Beach House Hotel**

10.   Sgt. Cahalan contacted the night manager and asked about the aforementioned Mercedes Benz, the parking pass (954) and its connection to the hotel. The night manager said that the vehicle was related to Room 214, but there were additional rooms being rented and several subjects. The night manager explained several credit cards had been authorized for use over the course of a few days.

11.   The night manager allowed Sgt. Cahalan to review some of the information provided for the rooms related to the Mercedes Benz (rooms 206, 208, and 214). All were authorized in the name of Kevin Yi, with various credit card account numbers. Sgt. Cahalan also noticed that each of the rooms was also reserved in names other than Yi. Based on Sgt. Cahalan's training and more than seventeen years' experience as a police officer, including several years as a Detective directly investigating fraud/identity theft crimes, he believed the rooms at the hotel may have been fraudulently obtained.

12.   I know from my training and experience in identity theft investigations, that Identity thieves involved in these crimes often use multiple credit cards in the name(s) of one of their victim(s) in order to rapidly deplete the victim's credit

limits across all the victim'(s) credit cards before the victim notices anything suspicious regarding any one account.

13.   Identity thieves also do this to obtain the credit card pre-authorization for the charges and sometimes they use different account numbers knowing that they may exceed the credit limit and do so in attempt to avoid detection by the victims and/or financial institutions.  Identity thieves also often make payments in one name for rentals and might use another identity for other charges, again, in an attempt to avoid detection by the victim, financial institution, and ultimately by law enforcement.

14.   Sgt. Cahalan also learned that room 214 was booked in the names of "Christopher Leyvas David" and "Helen Woo", paid for by Kevin Yi. HBPD attempted to make contact with the occupants at Room 214, but were not successful. The security guard at the location told Sgt. Cahalan that one of the subjects staying in room 214 had been seen driving a black Porsche and he advised Sgt. Cahalan that this person was currently sitting in the Porsche, parked in the hotel's underground lot.

**C.   HBPD Officers Contact STELLE at the Beach House Hotel While he was Sitting in a Porsche**

15.   At approximately 3:50 AM, HBPD made contact with the sole occupant of the aforementioned Porsche.  Sgt. Cahalan observed the man (later identified as STELLE) was seated in the driver's seat and was working on a laptop computer. Sgt. Cahalan contacted STELLE and asked if he could speak with STELLE, to

6

which he agreed. Sgt. Cahalan asked STELLE if he was staying in Room 214 and he told Sgt. Cahalan he was.

16.   STELLE told Sgt. Cahalan he was on Probation and had been in prison.  Sgt. Cahalan asked STELLE if he was on PRCS[1], and he said he was "CRV," meaning a Conditional Release Violator, and therefore on PRCS. Sgt. Cahalan knew from his training and experience that persons on PRCS are subject to search as a condition of their supervision, as are their possessions and residences.  (California Penal Code Section 3453)(f) provides that for persons on PRCS, "The person, and his or her residence and possessions, shall be subject to search at any time of the day or night, with or without a warrant, by . . . a peace officer."  Sgt. Cahalan conducted a record check on STELLE and confirmed that STELLE was on PRCS for identity theft and was subject to search. Sgt. Cahalan learned of STELLE's individual PRCS conditions, which included the "cell phone search" after recovery of the items, and that the search conditions did not specify computers, hard drives or thumb drives.

17.   Sgt. Cahalan again asked STELLE if he was staying in room 214 and he indicated he was, but indicated the room was in the name of Christopher David and Helen Yi, but then STELLE corrected himself and said the name Helen Woo. STELLE told Sgt. Cahalan the Porsche was being rented by Christopher David.  Sgt.

---

[1] Post Release Community Supervision (PRCS), is a form of supervision provided to an offender who has been released from a California Department of Corrections and Rehabilitation (CDCR) institution to the jurisdiction of a county agency.

Cahalan noted in his report that STELLE was in possession of the keys to the Porsche.

18.   After learning of STELLE's search conditions from Sgt. Cahalan, HBPD Officer Mateko conducted a search of STELLE. During the search of STELLE, HBPD found two Bank of America cash reward cards located in STELLE's pants pocket in the names other than STELLE.  These cards were still attached to the Bank of America mail piece and the mail indicated they were replacement cards. STELLE told HBPD that he found the cards in the parking lot.

19.   Based on STELLE's PRCS status, his possession of two bank cards that did not belong to him, the information the hotel provided regarding the numerous credit cards and names being used to stay in the rooms, and the fact STELLE indicated the Porsche was rented by "Christopher David", who was not at the location, Sgt. Cahalan began to conduct an initial search of the Porsche.

**D.   HBPD Initial Search of STELLE's Vehicle at The Beach House Hotel**

a.   In the front center console, Sgt. Cahalan indicated he located a California driver's license in the name of Christopher Leyvas David with STELLE's photo on it. Based on Sgt. Cahalan's training and experience, he believed the driver's license was fake. Sgt. Cahalan also located the vehicle rental agreement in the name "Christopher David". In the rear of the vehicle Sgt. Cahalan located a credit card embosser, which he knew was often used by identity thieves to create counterfeit credit cards.

Sgt. Cahalan also seized one of the SUBJECT DEVICES, a Black cellphone with a black leather case.

20.  Sgt. Cahalan could see there was also additional property to be collected, so he decided to have the vehicle towed to the HBPD where a more thorough search could be conducted.

21.  Based on all of the above, Sgt. Cahalan placed STELLE under arrest for violation of California Penal Code section 530.5(a )and transported STELLE to the HBPD jail for booking. The Porsche was subsequently towed to the station.

**E.   HBPD Search of STELLE's room at the Beach House Hotel**

22.  Based on STELLE's PRCS conditions, his acknowledgement of staying in room 214 at the Beach House Hotel, and his possession of the fake driver's license in the name of "Christopher L. David", the name under which the hotel reservation for room 214 was made, Sgt. Cahalan searched room 214 along with other members of the HBPD.

23.  At approximately 5:30 AM the same day, HBPD knocked on room 214 and there was no answer. Sgt. Cahalan used one of the Beach House key cards that STELLE had in his possession and successfully made entry into room 214.  During the search of room 214, HBPD seized one of the SUBJECT DEVICES, the Grey HP laptop computer.

24.  Additional items seized from the hotel room 214 included the following items, among others:

a. A credit card with the account number ground off
the front of the card;

9

b. A PayPal credit card (ending in numbers 1398) in the name of Kevin Yi;

c. A CalTech Staff ID Card;

d. Several pieces of clear "laminate" type plastic;

e. A payroll stub in the name of Shirley Wright;

f. A piece of Samsonite luggage found in the closet containing men's clothing, AAA cards in the names of Kinglsey and Judith Oguejiofor, CA DMV registration card for in the name of Jasmine Moud, and paperwork with personal information (birthdate) for Justin Tapp, a notebook containing personal information for persons other than STELLE, a grey, metal HP laptop with a Spiderman sticker; and

g. A credit card in the name of Panameno and a cashier's check made out to Rock Asylum

**F.    Secondary Search of STELLE's Vehicle at the HBPD**

25.   Once back at the HBPD, HBPD Officer Mateko searched the aforementioned towed Porsche.  Sgt. Cahalan reviewed all of the items Officer Mateko located in the Porsche, these included the remaining three SUBJECT DEVICES listed below. All five of the SUBJECT DEVICES are stored under case number DR #20-0001414:

a.   Grey ASUS laptop computer

b.   Black Cellphone with no case

c.   Black SanDisk Thumb Drive

26.   Additional items seized from the vehicle included the following items, among others:

a.   Numerous bank/credit cards in the names of persons other than STELLE. Sgt. Cahalan noted that there were six cards in the name of Kevin Yi;

b.   Three California driver's licenses, three Alabama driver's licenses and a Social Security Card in names other than STELLE. A clear laminate style plastic as well as fifteen additional debit/credit cards in names other than STELLE;

c.   Fraudulent DMV paperwork in the name of Christopher David, which included a photo of STELLE;

d.   A Beach House hotel parking pass for the Porsche, the Porsche rental agreement;

e.   A green Caliber notebook, which contained account and personal information for numerous other people, including for Christopher David and Kevin Yi. There was even a phone number in the notebook which was the same number the Beach House hotel had indicated had been provided to them under the room reservations;

f.   A notebook paper with writing indicating account information for a Helen Woo, which was another name listed on the Beach House hotel reservation and a name STELLE had previously provided as staying at the hotel;

g.   A credit card embossing machine and credit card reader/encoder; and

h.   A bag of U.S. Mail, predominantly from an address of 7025 Woodley in Los Angeles. The mail contained several different

names, apartment numbers and included bank statements and other
personal mail for many different people.

**G.   HBPD Victim Follow Up**

27.   On August 10, 2020, Sgt. Cahalan contacted Kevin Yi
via phone. Yi confirmed he had lost a bag containing his wallet
and personal information sometime in June or July 2020. Yi told
Sgt. Cahalan he did not open any of the accounts listed on the
credit cards recovered by HBPD during the aforementioned searches.
Yi did not know STELLE and did give anyone permission to use his
personal information.

28.   August 10, 2020, Sgt. Cahalan contacted victim
Christopher David Leyvas via phone and he confirmed he had lost
his driver's license in February 2020.  He did not know
STELLE and did not give anyone permission to use his personal
information.

**H.   HBPD Follow up With the Beach House Hotel**

29.   Sgt. Cahalan obtained and later reviewed documents
provided by the Beach House Hotel related to reservations for
rooms 206, 208, and 214.  This information included the following
notable items:

       a.   Two check-in slips and two invoices for room 214
in the name of Christopher David and Helen Woo for August 1, 2020
through August 10, 2020;

       b.   Multiple Beach House credit card authorization
forms, some in the name of Helen Woo, one in the name of
Christopher David and all with Kevin Yi as the purchaser. All of
the authorized card types/numbers were the same as the cards

Sgt. Cahalan located in STELLE's possession. There were photocopies of the credit cards as well as a California driver's license photo of Kevin Yi;

       c.   The credit card authorization in the name of Christopher David had a note indicating the credit card was for the rental of a car for Christopher David; and

       d.   There was additional correspondence from Black and White car rental with car renter listed as "Alexander Carrol", the card holder as Kevin Yi, and account numbers, which were the same as located in STELLE's possession. At the bottom of the document, it indicated Christopher David be allowed to drive the vehicle.

## I. STELLE Has Previously Been Convicted of Fraud Related Crimes and is on Supervised Release

30.   I reviewed STELLE's criminal history and learned that he has a lengthy rap sheet dating back to 1991.  His criminal history includes at least four felony convictions where he served prison time, including for identity theft charges in 2018 where he was sentenced to thirty-two months in state prison, a conviction for identity theft in 2015 where he was sentenced to three years in state prison, a conviction for vehicle theft in 2012 where he was sentenced to 133 days in jail, and in or about 1995, he was convicted of voluntary manslaughter and sentenced to fifteen years in state prison.

31.   I reviewed STELLE's PRCS report that HBPD obtained from a law enforcement database and I learned that STELLE was just placed on supervision in June 2020.  His terms specifically

include not being allowed to be in possession of stolen items,
or credit cards and identification cards in names other than his
own, and he has search conditions.  On August 12, 2020, I spoke
with STELLE's probation officer, Officer Tobias, who informed me
STELLE does have the search conditions previously mentioned and
that he is obliged to provide any passwords for his cellular
telephone as well.  On August 17, 2020, Officer Tobias informed
me the warrant for STELLE was active and the address placed on
the warrant is 392 MISTY FALLS, SIMI VALLEY, CA 93065.

### V.  TRAINING AND EXPERIENCE ON SUBJECT OFFENSES

32.  Based upon my training and experience, including
investigations involving access device fraud and identity theft,
I know that:

a.  People involved in access device fraud and
identity theft commonly utilize telephones, computers, and/or
other digital devices to further their illegal operations,
including cellular telephones and computers.  For example,
digital devices allow these individuals to: (1) purchase or
obtain personally identifiable information belonging to other
people, or other items such as profiles, trade lines, or credit
reports; (2) establish or modify fraudulent bank accounts or
credit card accounts; (3) use fraudulently obtained bank
accounts or credit card accounts to make purchases, including
purchases for additional personal identifying information; and
(4) track and keep records of their crimes, such as pay/owe
records for the fraud scheme.  Digital devices also provide
relative anonymity, by allowing these individuals to conduct

14

these actions electronically, over the Internet. People involved in access device fraud and identity theft also often use computers to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ computers for the purposes, among others, of: 1) applying on-line for fraudulent credit cards; 2) obtaining personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts, and/or making counterfeit access devices; 3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; and 4) keeping records of their crimes.

b.   People involved in access device fraud and identity theft commonly maintain addresses and/or telephone numbers in their telephones, computers, and/or other digital devices which reflect names, addresses, and/or telephone numbers of their associates in the fraud scheme and victims of the fraud scheme.  People involved in access device fraud and identity theft are commonly in contact with these associates around the time that they conduct fraud transactions via telephones, computers, and/or other digital devices, and that they often keep records of recent ingoing and outgoing calls, emails, voicemails, text messages, social media messages, and other communications.

c.   People involved in access device fraud and identity theft often use the text messaging feature which allows

15

individuals to send text messages over their telephones, computers, and/or other digital devices, to contact their associates in the fraud scheme and victims of the fraud scheme and to avoid detection by law enforcement through the use of this feature.

      d.   People involved in access device fraud and identity theft often electronically send photographs or videos of individuals, documents and other records, places, and things relating to associates in the fraud scheme.

      e.   People involved in access device fraud and identity theft often times leave and receive voicemail messages with associates in the fraud scheme and victims of the fraud scheme related to the fraud scheme over text and social media.

      f.   Identifying the names and numbers in telephones, computers, and/or other digital devices, (as well as GPS information on the devices) believed to be used by a person involved in access device fraud and identity theft can lead to the identification of associates in the fraud scheme and other potential victims of the fraud scheme, the location of fraud proceeds (including where the fraud proceeds are stored and used), the geographic breadth of the fraud scheme, and the identities of potential organizers, leaders, managers, or supervisors of the fraud scheme by examining the calling patterns of these individuals.

      g.   Identity thieves oftentimes keep evidence of their schemes for years for many reason, including but not limited to: in order to further their schemes, learn more about

their victims, to learn from their mistakes and attempt to
perfect their skills as an identity thief, and because of the
sheer large volume of information needed to conduct fraud
schemes it would be impossible to remember all of the
information the identity thieves collect for their fraud
schemes.

h.   Successful identity thieves who generate large
sums of money from their fraud often launder the proceeds of
their fraud to make them appear legitimate or put them beyond
the reach of law enforcement.  Typically this is done by wiring
or depositing cash into bank accounts or other investment
vehicles such as brokerage accounts.  Evidence of these types of
transactions can often be found by searching telephones,
computers, and/or other digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

33.  As used herein, the term "digital device" includes the
SUBJECT DEVICES.

30.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur

after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

          b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

          c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

          d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain

18

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

31.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

34.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

35.  Based on the foregoing facts, there is also probable cause to believe that the items listed in Attachment B, which

constitute evidence, fruits, and instrumentalities of violations

of the Subject Offenses described above, will be found on the

SUBJECT DEVICES described in Attachment A.


Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this _____ day of August,
2020.


_____
UNITED STATES MAGISTRATE JUDGE